UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

**CIVIL ACTION NO. 4:19CV-00142-JHM**

**CHARLEY BARBER, et al.**                                                                 **PLAINTIFFS**

**V.**

**ARCH INSURANCE COMPANY**                                                        **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on cross-motions for summary judgment. [DN 21, DN 22]. Fully briefed, these matters are ripe for decision.

## I.  BACKGROUND

This controversy arises out of an insurance contract dispute between Plaintiffs, Charley Barber, Glendel Hardison, Brian Casebier, Steve DeMoss, Billie Hearld, John Scott, Dwight Fulkerson, and Jeremy Hackney ("Plaintiffs"), and Defendant, Arch Insurance Company. Plaintiffs seek insurance coverage under the Directors, Officers, and Organization Liability Coverage Part ("D&O Coverage Part") of two consecutive corporate liabilities polices issued by Defendant, Arch Insurance Company ("Arch"), to Armstrong Coal Company, Inc. ("Armstrong") for the August 1, 2014, to August 1, 2015, Policy Period and for the August 1, 2015, to August 20, 2016, Policy Period.

**A.  Insurance Policies**

Armstrong provided D&O Coverage to Plaintiffs under Policy No. PCD 9301711-00 for the Policy Period of August 1, 2014 through August 1, 2015 ("2014-2015 Policy"). Armstrong renewed the policy and provided D&O Coverage to Plaintiffs under Policy No. PCD 9301711-01 for the Policy Period of August 1, 2015, through August 1, 2016 ("2015-2016 Policy"). The 2014-

2015 Policy and the 2015-2016 Policy ("the policies") purchased by Armstrong and issued by Arch provide coverage to two type of insureds: Insured Person and Insured Organization. "Insured Person" means an executive or employee. [DN 22-5 at D&O Coverage part, §2.F]. The Plaintiffs are within the definition of this term. "Insured Organization" is defined as the named organization or any subsidiary. [*Id*. at General Provisions, §2.K]. Armstrong is within the definition of this term.

The coverage provided to each type of insured, subject to certain exclusions, is set forth in the Directors, Officers, & Organization Liability Coverage Part of the policies which established Arch's obligation to pay for an insured's loss in four distinct "Insuring Agreements"—"Insured Person Liability," "Organization Reimbursement," "Organization Liability," and "Derivative Demands." [DN 22-5, D&O Coverage Part §1.A-D]. Relevant here, § 1.A of the D&O Coverage Part establishes Arch's obligation to pay for "**Non-Indemnifiable Loss** on behalf of the **Insured Persons** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insured Persons**." [DN 22-5, D&O Coverage Part §1.A]. By contrast, § 1.C of the D&O Coverage Part establishes Arch's obligation to pay for "**Loss** on behalf of an **Insured Organization** resulting from a **Claim** first made against such **Insured Organization** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by an **Insured Organization**." [DN 22-5, D&O Coverage Part §1.C].

The Policies define "claim" as any:

1. written demand or notice for civil monetary damages or other civil non-monetary relief commenced by the **Insured's** receipt of such demand or notice;
2. civil proceeding, including but not limited to any arbitration proceeding or other alternative dispute resolution (ADR) proceeding, commenced by the

        service upon the **Insured** of a complaint, demand for arbitration, or similar pleading;

3. a criminal proceeding commenced by the return of an indictment, information, or similar document;
4. formal civil, criminal, administrative, or regulatory proceeding commenced by the filing of a notice of charges or similar document, or by the entry of a formal order of investigation or similar document;
5. solely for purposes of Insuring Agreement D, any **Derivative Demand**;
6. written request to an **Insured** to toll or waive the statute of limitations regarding a potential **Claim** as described in 1 and 2 above commenced by the **Insured's** receipt of such request;
7. civil, criminal, administrative, or regulatory investigation of an **Insured Person** once such **Insured Person** is identified by name in a Wells Notice, subpoena or target letter by such investigating authority as a person against whom a proceeding described in 2, 3 or 4 above may be commenced; or
8. with respect to a criminal proceeding described in 3 above, official request for **Extradition**, including the execution of an arrest warrant where such execution is an element of the request for **Extradition**.

[*Id*. at D&O Coverage Part, §2.A, as amended by End. No. 2]. "Wrongful Act" is defined as "any actual or alleged . . . act, error, omission, misstatement, misleading statement, neglect or breach of duty by **Insured Persons** in their capacity as such or in an **Outside Capacity** or, with respect to Insuring Agreement C, by any **Insured Organization**[.]" (*Id*. at D&O Coverage Part, § 2.L).

As a condition to coverage, the policies required timely written notice of any claim. Specifically, § 9 of the General Provisions provides:

Regarding the **Liability Coverage Parts** only:

A. As a condition precedent to coverage, the **Insureds** shall give the **Insurer** written notice of any **Claim** as soon as practicable after the chief executive officer, chief financial officer, general counsel or risk manager of an **Insured Organization** first becomes aware of such **Claim**, but no later than 60 days after the end of the **Policy Period** or the Extended Reporting Period, if applicable. Such notice shall specify the **Liability Coverage Part** under which notice is being given.

B. If, during the **Policy Period** or Extended Reporting Period, if applicable, the **Insureds** become aware of a **Wrongful Act** that may reasonably be expected to give rise to a **Claim** against an **Insured** for which coverage may be available under a **Liability Coverage Part**, and if written notice of such **Wrongful Act** is given to the **Insurer** during the **Policy Period** or Extended Reporting Period, if applicable, specifying the (i) reasons for anticipating such a **Claim**, (ii) nature and

3

> date of the **Wrongful Act**, (iii) identity of the **Insureds** involved, (iv) injuries or damages sustained, (v) names of potential claimants, (vi) manner in which the **Insureds** first became aware of the **Wrongful Act** and (vii) the **Liability Coverage Part** under which such notice is being given, then any **Claim** subsequently arising from such **Wrongful Act** shall be deemed to be a **Claim** first made at the time that the **Insurer** receives such notice.

(*Id.* at General Provisions, § 9.A, as amended by End No. 1, and § 9.B) (the "Notice Provisions").

## B. Administrative and Criminal Investigation

On January 24, 2014, the Federal Mine Safety and Health Administration ("MSHA") issued a citation to Armstrong. [DN 22-7 at 13–14]. The citation asserted that Armstrong violated the Federal Mine Safety and Health Act of 1977, 20 U.S.C. § 801, et seq., at its Parkway Mine by placing devices designated to be worn by two continuous-mining machine operators and designed to monitor respirable coal-dust concentrations in areas away from mining operations. [*Id.* at 12]. On April 10, 2015, the United States Department of Labor filed a Petition for the Assessment of Civil Penalty against Armstrong with the Federal Mine, Safety, and Health Review Commission incorporating the 2014 MSHA citation. [*Id.* at 1–2]. Both the petition and citation alleged that Armstrong violated the Federal Mine Safety and Health Act and 30 C.F.R. § 70.201(b) by manipulating dust sampling equipment and testing processes at its Parkway Mine. Armstrong answered and contested the petition on May 8, 2015. [DN 22-8 at 4–7]. Neither the petition nor citation in this civil penalty proceeding contained any allegations against any of the individual Plaintiffs.

On September 2, 2015, the United States Attorney sent Armstrong a subpoena for documents related to Armstrong's Parkway Mine. [DN 22-9]. On July 20, 2016, Armstrong received notice from the Office of the United States Attorney for the Western District of Kentucky of its intent to pursue charges against the company and one or more of its current and former employees arising from a criminal investigation into respirable dust sampling practices at

4

Armstrong's Parkway Mine. Specifically, the United States alleged that between September 28, 2012, and February 24, 2014, Armstrong and its employees obtained fraudulent dust samples during mining operations and submitted such sampling information to MSHA. Within the same correspondence, the United States Attorney delivered a proposed Plea Offer to Armstrong which also mentioned Charley Barber. [DN 21-4].

On July 29, 2016, Armstrong through its General Counsel notified Arch of "a Claim . . . asserted against . . . Armstrong. . . and certain of its current and former employees arising from an investigation by the Assistant United States Attorney for the Western District of Kentucky." [DN 21-5 at 1; DN 22-10]. Specifically, Armstrong informed Arch that "[o]n July 20, 2016, Armstrong received notice from the U.S. Attorney of its intent to pursue charges against Armstrong and one or more of its current and former employees arising from an investigation into respirable dust sampling practices at Armstrong's Parkway mine located in Muhlenberg County, Kentucky." [*Id*.]. Armstrong informed Arch of the content of the July 20, 2016, letter and enclosed the copy of the proposed Plea Offer to Armstrong. Armstrong also informed Arch that

> [t]he U.S. Attorney advised that, in addition to charges against Armstrong, the following current and former Armstrong employees have been targeted in connection with the investigation, and will be issued target letters: Billie Herald, Keith Casebier, Steve DeMoss, Dwight Fulkerson, Keith Whitehouse, and Ronald Ivy. The U.S. Attorney also advised that charges will be sought against former Armstrong employee Charles Barber.

[*Id*.].

On November 16, 2016, Arch denied Armstrong's request for coverage on grounds that: (1) the criminal investigation and Plea Offer did not constitute a "Claim" under § 2.A. of the D&O Coverage Part, but Arch accepted it as a notice of circumstances under the Notice Provisions found in § 9.B. of the General Provisions of the policy and (2) the pollution exclusion applied because coal dust constitutes a "solid contaminant" and/or "solid irritant." [DN 21-6 at 4–6; DN 22-13].

In mid-November 2016, the United States Attorney issued letters to five of the Plaintiffs advising that they were targets of the Investigation into "the falsification of dust sample results at Parkway Mine between September 28, 2012, and February 24, 2014." [DN 21-7; DN 22-14]. Armstrong submitted the target letters to Arch and requested coverage for the investigation in December 2016. [DN 22-15]. On January 18, 2017, the United States Attorney issued a subpoena to Armstrong in conjunction with its criminal investigation mandating production of documents related to the alleged fraudulent coal dust sampling. [DN 21-8; DN 22-15]. On June 22, 2017, Arch acknowledged receipt of the target letters and subpoenas, but upheld its denial of coverage. [DN 21-9; DN 22-16].

On July 11, 2018, the United States indicted each Plaintiff, with the exception of Hardison, on charges related to dust sampling procedures engaged in at the Parkway Mine. *United States v. Barber, et al.*, No. 4:18-CR-15-JHM (Western District of Kentucky). On February 26, 2019, the United States filed a superseding indictment adding Hardison as a defendant alleging that between January 1, 2013, and August 8, 2015, Plaintiffs:

> conspired to commit dust fraud by knowingly and willfully altering the company's required dust-sampling procedures, by circumventing the dust-sampling regulations, submitting false samples, and by making false statements on dust certification cards. . . . By circumventing the dust-sampling procedures, Armstrong Coal and [Plaintiffs], avoided implementing ventilation and production controls that might cost money or lower production, and thus were able to save money at the expense of exposing the miners employed at the Parkway and Kronos mines to the risks of breathing air with elevated levels of respirable coal dust[.]

[DN 21-10, DN 22-1, Superseding Indictment ¶ 1].

Upon receipt of the superseding indictment, Hardison submitted his individual Notice of Claim pursuant to § 9.B of the Policies and requested indemnification and defense of his Claims. [DN 21-11]. Arch denied Hardison's request for coverage under the policies on the same grounds. [DN 21-12]. Plaintiffs then filed this lawsuit on September 25, 2019, seeking coverage for the

federal criminal investigation and criminal action. [DN 1 at ¶ 1]. Plaintiffs assert causes of action for declaratory and injunctive relief, breach of contract, unfair settlement practices, and bad faith. [*Id.* at ¶¶ 25-49]. The parties have brought cross-motions for summary judgment.

## II. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## III. DISCUSSION

At the outset, the Court notes that disposition of the motions is a matter of contract interpretation. The parties by their arguments agree that Kentucky law governs the interpretation

of these insurance contracts. *Certain Underwriters at Lloyd's of London v. N.F.C. Mining, Inc.*, No. CV 07-51-GFVT, 2010 WL 11538243, at *3 (E.D. Ky. Jan. 27, 2010), aff'd sub nom. *Certain Underwriters At Lloyd's of London v. NFC Mining, Inc.*, 427 F. App'x 404 (6th Cir. 2011). "Under Kentucky choice of law principles, the law of the 'state [which] has the most significant relationship to the transaction and the parties' governs the interpretation and validity of contracts." *Id.* (quoting *Lykins Enterprises, Inc. v. Felix*, 2007 WL 4139637 (Ky. 2007)). While Arch is a Missouri corporation with its principal place of business in New Jersey, the Plaintiffs are citizens of Kentucky and the alleged events occurred at Armstrong's Parkway Mine and Kronos Mine in Kentucky. Accordingly, Kentucky has the most significant relationship to this insurance contract.

The interpretation of an insurance contract is a question of law for the Court to decide. *Kemper Nat'l Ins. Cos. v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 871 (Ky. 2002); *Equitania Ins. Co. v. Slone & Garrett, P.S.C.*, 191 S.W.3d 552, 556 (Ky. 2006). "In construing a contract, a court's primary objective is to ascertain and to effectuate the intention of the parties to the contract from the contract itself." *Logan Fabricom, Inc. v. AOP P'ship LLP*, No. 2004-CA-002410-MR, 2006 WL 3759412, *2 (Ky. Ct. App. Dec. 22, 2006). "[I]n the absence of ambiguity, a written instrument will be enforced strictly according to its terms, and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003) (quotation and citation omitted); *see also York v. Kentucky Farm Bureau Mutual Ins. Co.*, 156 S.W.3d 291, 293 (Ky. 2005) ("The clear and unambiguous words of an insurance contract should be given their plain and ordinary meaning."); *Auto Club Prop.-Cas. Ins. Co. v. B.T. ex rel. Thomas*, 596 Fed. Appx. 409, 412 (6th Cir. 2015). However, "[i]f the contract language is ambiguous, it must be liberally construed to resolve any doubts in favor of the insured." *Wolford v. Wolford*, 662 S.W.2d 835, 838 (Ky. 1984). "A contract

is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002).

In their cross-motions for summary judgment, the parties raise two primary issues: (1) whether Plaintiffs timely notified Arch of the claims made against them and (2) whether the pollution exclusion bars Plaintiffs' claims. Because an examination of the pollution exclusion resolves the case, the Court finds it unnecessary to address the timeliness of notice.

**A. Pollution Exclusion**

Arch maintains that the Pollution Exclusion contained in the policies in question bars coverage.

Section 4.A.4 of the policies ("Pollution Exclusion") provides

> The **Insurer** shall not pay **Loss** for any **Claim** against an Insured . . . arising from, based upon, or attributable to any:
>
> a. discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**, nuclear material or nuclear waste or any threat of such discharge, dispersal, release, escape, seepage, migration or disposal; or
>
> b. direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, nuclear material or nuclear waste[.]

[DN 22-5, D&O Coverage Part, § 4.A.4, as amended by End No. 2]. Under § 2.T of the Policies, "Pollutants" is defined as "any solid, liquid, gaseous, biological, radiological or thermal contaminant or irritant, including, without limitation, smoke, vapor, soot, fumes, acids, alkalis, chemicals, mold, fungi, odors, noise, lead, oil or oil products, radiation, asbestos or asbestos containing products, waste or any electric, magnetic, or electromagnetic field of any frequency." [*Id*. at General Provisions, § 2.T]. Arch contends that the underlying criminal action triggers both prongs of the pollution exclusion, though either independently excludes coverage.

Plaintiffs argue that the mere presence of coal dust in the mine does not bar coverage under the policies unless there is an actual or threatened discharge of coal dust. [DN 27 at 2–5; DN 24 at 9]. Plaintiffs maintain that because the underlying criminal charges against them are limited to fraudulently reporting dust monitoring and sampling requirements of the Mine Act and therefore do not arise from the release or discharge of any pollutants into the environment, the pollution exclusion does not preclude coverage. [DN 24 at 8]. This argument is belied by the plain language of the policies.

The pollution exclusion not only excludes losses for any claim arising from the threatened or actual release of pollutants under subparagraph (a), but also excludes losses for any claim "arising from, based upon, or attributable to any" direction or request "to test for" or "monitor" pollutants under subparagraph (b). [DN 22-5, D&O Coverage Part, § 4.A.4, as amended by End No. 2]. Thus, only subparagraph (a) of the pollution exclusion requires actual or threatened discharge. "Whether any pollutants actually leaked is immaterial" to whether the claims based on the underlying criminal allegations trigger subparagraph (b) of the pollution exclusion. *Arch Ins. Co. v. Commercial Steel Treating Corp.*, No. 11-CV-15535, 2013 WL 4536163, at *6 (E.D. Mich. Aug. 27, 2013).

Next, Plaintiffs contend that coal dust should not be considered a "pollutant" under the policies in light of the facts of the case. Specifically, Plaintiffs maintain that coal dust confined inside a coal mine, where it is supposed to be, is not a pollutant. Plaintiffs argue that in every case cited by Arch, the coal dust—the "pollutant"—left its intended location and caused some injury. *See U.S. Fidelity and Guar. Co. v. Star Fire Coals, Inc.*, 856 F.2d 31, 33 (6th Cir. 1988) (coal "dust allegedly drifted over and fell onto [plaintiff's] property causing him to suffer injuries and property damage"); *Certain Underwriters At Lloyd's of London v. NFC Mining, Inc.*, 427 F. App'x

404, 405 (6th Cir. 2011) (claim based upon coal dust and noise emanating from company's coal operations and damaging neighboring homes); *Grizzly Processing, LLC v. Wausau Underwriters Ins. Co.*, No. CIVA7:08-226-KKC, 2010 WL 934250, at *5 (E.D. Ky. Mar. 11, 2010) (homeowners alleged that the mine activities caused their residences to be contaminated with coal dust). Additionally, relying upon *Certain Underwriters at Lloyd's, London v. Abundance Coal, Inc.*, Plaintiffs argue that the Court should consider the pollution exclusion clauses on a case-by-case basis. *Certain Underwriters at Lloyd's, London v. Abundance Coal, Inc.*, 352 S.W.3d 594, 598 (Ky. Ct. App. 2011) ("[A]bsolute pollution exclusions, which do not appear ambiguous on their face can be ambiguous in application given certain factual situations.") (citing *Motorists Mut. Ins. Co. v. RSJ, Inc.*, 926 S.W.2d 679, 680–82 (Ky. Ct. App.1996)).

The policies define Pollutant to include "any solid, liquid, gaseous, biological, radiological or thermal contaminant or irritant, including, without limitation, smoke, vapor, soot, fumes, acids, alkalis, chemicals, mold, fungi, odors, noise, lead, oil or oil products, radiation, asbestos or asbestos containing products, water or any electric, magnetic, or electromagnetic field of any frequency." [DN 22-5, General Provisions, § 2.T]. Thus, the question is whether coal dust under the facts of this case is included in the definition of pollutant; in other words, whether coal dust is a contaminant or irritant. *Id*.

Courts generally have determined that coal dust is a contaminant or irritant. In fact, the Occupational Safety and Health Administration has classified coal dust as an air contaminant. *Grizzly Processing, LLC v. Wausau Underwriters Ins. Co.*, No. CIVA7:08-226-KKC, 2010 WL 934250, at *5 (E.D. Ky. Mar. 11, 2010) (citing 29 C.F.R. § 1910.1000). Additionally, "Congress has recognized that coal dust inhalation causes permanent damage," including coal pneumoconiosis otherwise known as black lung disease. *Id*. at *5 (citing *Plesh v. Director, OWCP*,

11

71 F.3d 103, 108 (3rd Cir. 1995)). Pneumoconiosis is "'a disease of the lungs caused by the habitual inhalation of irritant material.'" *RLI Ins. Co. v. Gonzalez*, 411 F. App'x 696, 698 (5th Cir. 2011) (quoting Webster's Third New International Dictionary 1746, 2118). *See also U.S. Fidelity and Guar. Co. v. Star Fire Coals, Inc.*, 856 F.2d 31, 33 (6th Cir. 1988).

Plaintiffs' reliance on *Certain Underwriter's at Lloyd's, London v. Abundance Coal, Inc.*, 352 S.W.3d 594, 598 (Ky. Ct. App. 2011) does not alter this conclusion. In *Abundance Coal*, the Kentucky Court of Appeals held that the pollution exclusion in that case was ambiguous when applied to the underlying claim that the policyholder had tortiously caused coal dust to enter the underlying plaintiff's rental property. Significant to that opinion was the court's determination that the environmental terms—"discharge," "dispersal," "seepage," "migration," "release," and "escape"—were terms of art which led the court to conclude that the use of such terms "reflect[ed] the exclusion's historical objective—avoidance of liability for environmental catastrophes related to intentional industrial pollution." *Id*. at 598–599. Here, as noted, the pollution exclusion, in contrast to the exclusion in *Abundance Coal*, contains subsection (b) which does not utilize those terms in the policies' exclusion of claims that arise out of testing or monitoring pollutants. *Id*.

Additionally, in addressing the pollution exclusion, the Kentucky Court of Appeals in *Abundance Coal* considered "the practical consequences of the way in which [the court] appl[ies] a provision" and held that "coal dust, debris, and particulate matter may not ordinarily be classified as a pollutant, but such matter may constitute pollution in some cases (such as when the substance that has become airborne is particularly noxious)." *Id*. at 599. Here, as recognized by Plaintiffs in their briefs, MSHA requires mandatory testing of respirable coal dust in an effort to keep the exposure of employees to air contaminants within the limits prescribed by law—in other words to prevent exposure to noxious airborne contaminants.

For these reasons, the Court finds that coal dust constitutes a "pollutant" under the policies.

Therefore, the remaining question is whether subparagraph (b) of the pollution exclusion bars coverage of Plaintiffs' claims. The Court concludes that it does. As discussed above, subparagraph (b) of the pollution exclusion applies to any claim arising from, based upon, or attributable to any direction or request "to test for" or "monitor" pollutants. The superseding indictment alleges that Plaintiffs "conspired to commit dust fraud by knowingly and willfully altering the company's required dust-sampling procedures, by circumventing the dust-sampling regulations, submitting false samples, and by making false statements on dust certification cards." [DN 22-1 at ¶ 1]. The alleged purpose of the conspiracy was "to commit and to conceal from MSHA the ongoing, systemic, and pervasive violation of mandatory health and safety standards, including but not limited to the average concentration of respirable dust within Parkway and Kronos mines, along with violations of the monitoring and sampling requirements of the Mine Act." [*Id*. at ¶ 14]. Thus, the criminal charges arise out of the direction from MSHA, via the regulations, to test and monitor coal dust to limit miner's exposure to coal dust.

The district court in *Arch Ins. Co. v. Commercial Steel Treating Corp.*, No. 11-CV-15535, 2013 WL 4536163, at *1 (E.D. Mich. Aug. 27, 2013), addressed the same language of the pollution exclusion and similar facts. In *Commercial Steel,* the insureds operated a steel treating company and, for certain treatments, required a permit from the state which, among other items, mandated the installation and operation of a scrubber and mandated that the exhaust gases be discharged at least 35 feet above ground. The insureds failed to comply for a period of time with the permit due to damage to the exhaust pipes from a storm, and, as a result, two employees were indicted for failure to report an equipment malfunction to the state and for two counts of failure to comply with the permit from the state. *Id*. at *2. Relevant to the present case, the court determined that

13

subsection (b) of the pollution exclusion applied to bar coverage for the criminal charges against the insureds. The court concluded that "even if there was no threatened or actual release of pollutants . . . , the criminal charges arise out of a direction or request from [the state], via the [permit], to abate potentially hazardous pollutants." *Id*. at 5. Accordingly, the district court held that subparagraph (b) of the pollution exclusion applied to the criminal charges and barred coverage for the underlying criminal matters against the individual insureds. *Id*. at *6.

Similarly, here, the allegations of the superseding indictment expressly implicate subparagraph (b) in that the United States—through the Mine Act—directed Plaintiffs to test for and monitor coal dust, and Plaintiffs allegedly violated that direction by defying the "monitoring and sampling requirements of the Mine Act." [DN 22-1 at ¶¶ 6–8, 14]. In fact, throughout their briefs, Plaintiffs admit that: (1) "Plaintiffs are charged with concealing from MSHA the alleged violations of dust monitoring and sampling requirements of the Mine Act;" (2) the criminal action involved "underground dust testing [which] . . . is performed to limit miner's exposure to coal dust;" (3) Plaintiffs' "charges are limited to the fraudulent reporting of sampling requirements to a federal agency;" (4) "The Indictment alleged that these individuals conspired to commit dust fraud by knowing and willfully altering Armstrong's required dust-sampling procedures, circumventing the dust-sampling regulations, submitting false samples, and making false statements on dust certification cards;" and (5) "Plaintiffs are alleged to manipulate the recording of the concentration of respirable dust as a means to defraud the federal government and MSHA. Both the government and MSHA fully expect to find coal dust in the mine, but they only test the dust levels to promote miner safety." [DN 21-1 at 12, 21; DN 24 at 8]. Accordingly, there is no dispute that the claim arises from, is based upon, or is attributable to the MSHA direction to test

for and monitor coal dust, thereby triggering subparagraph (b) of the pollution exclusion. *See Commercial Steel*, 2013 WL 4536163, at *6.

Finally, "the language of an insurance policy, not an insured's expectations, controls disputes over the meaning of a policy." *Certain Underwriters At Lloyd's of London v. NFC Mining, Inc.*, 427 F. App'x 404, 405 (6th Cir. 2011). Here, the pollution exclusion excludes loss from any claim that arises from, is based upon, or is attributable to the MSHA direction to test for and monitor "any solid, liquid, gaseous, biological, radiological or thermal contaminant or irritant, including, without limitation, smoke, vapor, soot, fumes, acids, alkalis, [and] chemicals," "which includes coal dust, a solid irritant (to the eyes, nose or lungs)." *Id*. "The clarity of the exclusion forecloses [Plaintiffs'] resort to expectations about what the contract did or did not cover." *Id*.

For these reasons, the Court finds that the pollution exclusion precludes coverage of the underlying criminal action.

**B. Bad Faith Claim**

Arch has no contractual obligation to provide coverage to Plaintiffs under the insurance policies. "Absent a contractual obligation [to pay a claim], there simply is no bad faith cause of action, either at common law or by statute." *Davidson v. Am. Freightways, Inc.*, 25 S.W.3d 94, 100 (Ky. 2000) (absent a contractual obligation to pay a claim, an insured has no UCSPA cause of action); *Kentucky Nat. Ins. Co. v. Shaffer*, 155 S.W.3d 738, 742 (Ky. Ct. App. 2004), as modified (Feb. 4, 2005) ("in absence of a contractual obligation in an insurance policy for coverage, there can be no claim for bad faith"). Accordingly, Arch cannot be liable for any bad faith claims.

### IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the Plaintiffs' joint motion for summary judgment [DN 21] is **DENIED** and Defendant's motion for summary

judgment [DN 22] is **GRANTED**.  A judgment consistent with this opinion will be entered.

cc: counsel of record

Joseph H. McKinley Jr., Senior Judge
United States District Court

October 15, 2020